**LeClairRyan**

*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Howard Johnson International, Inc.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HOWARD JOHNSON INTERNATIONAL, INC., a Delaware Corporation, | : |
| Plaintiff, | :      Civil Action No. 17- |
| v. | :      **COMPLAINT** |
| JANU HOSPITALITY, INC., a New York Corporation; HITESH PATEL, an individual; and ALKA PATEL, an individual, | : |
| Defendants. | : |

Plaintiff Howard Johnson International, Inc., by its attorneys, LeClairRyan, complaining of defendants, Janu Hospitality, Inc., Hitesh Patel, and Alka Patel, says:

**PARTIES, JURISDICTION AND VENUE**

1.  Plaintiff Howard Johnson International, Inc. ("HJI") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

2.  Defendant Janu Hospitality, Inc. ("Janu Hospitality"), on information and belief, is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 1156 Upper Front Street, Binghamton, New York 13905.

3.     Defendant Hitesh Patel, on information and belief, is a principal of Janu Hospitality and a citizen of the State of New York, having an address at 1156 Upper Front Street, Binghamton, New York 13905.

4.     Defendant Alka Patel, on information and belief, is a principal of Janu Hospitality and a citizen of the State of New York, having an address at 1156 Upper Front Street, Binghamton, New York 13905.

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.     This Court has personal jurisdiction over Janu Hospitality by virtue of, among other things, section 17.6.3 of the June 24, 2008 license agreement by and between Janu Hospitality and HJI (the "License Agreement"), described in more detail below, pursuant to which Janu Hospitality has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

7.     This Court has personal jurisdiction over Hitesh Patel and Alka Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Hitesh Patel and Alka Patel acknowledged that they were personally bound by section 17 of the License Agreement.

8.     Venue is proper in this District pursuant to section 17.6.3 of the License Agreement, inasmuch as that provision contains an express waiver by Janu Hospitality of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

9.      On or about June 24, 2008, HJI entered into the License Agreement with Janu Hospitality for the operation of a 65-room Howard Johnson® guest lodging facility located at 1156 Upper Front Street, Binghamton, New York 13905, designated as Site No. 23892-73426-02 (the "Facility").  A true copy of the License Agreement is attached hereto as Exhibit A.

10.     Pursuant to section 5 of the License Agreement, Janu Hospitality was obligated to operate a Howard Johnson® guest lodging facility for a fifteen-year term.

11.     Pursuant to section 7, section 18.1, and Schedule C of the License Agreement, Janu Hospitality was required to make certain periodic payments to HJI for royalties, marketing contributions, taxes, interest, and other fees (collectively, "Recurring Fees").

12.     Pursuant to section 7.3 of the License Agreement, Janu Hospitality agreed that interest is payable "on any past due amount payable to [HJI] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

13.     Pursuant to section 3.8 of the License Agreement, Janu Hospitality was required to disclose to HJI, among other things, the amount of gross room revenue earned by Janu Hospitality at the Facility for purposes of establishing the amount of royalties and other Recurring Fees due to HJI.

14.     Pursuant to section 3.8 of the License Agreement, Janu Hospitality agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the

License Agreement, Janu Hospitality agreed to allow HJI to examine, audit, and make copies of the entries in these books, records, and accounts.

15.    Pursuant to section 11.2 of the License Agreement, HJI could terminate the License Agreement, with notice to Janu Hospitality, if Janu Hospitality (a) discontinued operating the Facility as a Howard Johnson® guest lodging establishment; and/or (b) lost possession or the right to possession of the Facility.

16.    Pursuant to section 12.1 of the License Agreement, Janu Hospitality agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, it would pay liquidated damages to HJI in accordance with a formula specified in the License Agreement.

17.    Section 18.4 of the Franchise Agreement specifically set liquidated damages for the Facility at $1,000.00 for each guest room of the Facility Janu Hospitality was authorized to operate at the time of termination.

18.    Pursuant to section 17.4 of the License Agreement, Janu Hospitality agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

19.    Effective as of the date of the License Agreement, Hitesh Patel and Alka Patel provided HJI with a Guaranty of Janu Hospitality's obligations under the License Agreement. A true copy of the Guaranty is attached hereto as Exhibit B.

20.    Pursuant to the terms of the Guaranty, Hitesh Patel and Alka Patel agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause [Janu Hospitality] to perform, each unpaid or unperformed obligation of [Janu Hospitality] under the [License] Agreement."

21.     Pursuant to the terms of the Guaranty, Hitesh Patel and Alka Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by HJI in enforcing its rights or remedies under the Guaranty or the License Agreement.

### The Termination of the License Agreement

22.     On or about December 17, 2016, Janu Hospitality advised HJI that, on January 1, 2017, it would cease to operate the Facility as a Howard Johnson® guest lodging facility, thereby causing the unilateral termination of the License Agreement.

23.     By letter dated February 23, 2017, a true copy of which is attached as Exhibit C, HJI acknowledged Janu Hospitality's unilateral termination of the License Agreement, effective January 1, 2017, and advised Janu Hospitality that it was required to pay to HJI as liquidated damages for premature termination the sum of $65,000.00 as required under the License Agreement, and all outstanding Recurring Fees through the date of termination.

### FIRST COUNT

24.     HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 23 of the Complaint.

25.     Pursuant to sections 3.8 and 4.8 of the License Agreement, Janu Hospitality agreed to allow HJI to examine, audit, and make copies of Janu Hospitality's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

26.     The calculation of the monetary amounts sought by HJI in this action is based on the gross room revenue information supplied to HJI by Janu Hospitality and, to the extent there has been non-reporting, HJI's estimate as to the gross room revenue earned by Janu Hospitality.

27.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Janu Hospitality.

**WHEREFORE**, HJI demands judgment ordering that Janu Hospitality account to HJI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the License Agreement.

## SECOND COUNT

28.     HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 27 of the Complaint.

29.     On or about December 17, 2016, Janu Hospitality advised HJI that, on January 1, 2017, it would cease to operate the Facility as a Howard Johnson® guest lodging facility, thereby causing the unilateral termination of the License Agreement.

30.     By letter dated February 23, 2017, HJI acknowledged Janu Hospitality's unilateral termination of the License Agreement, effective January 1, 2017.

31.     Section 12.1 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Licensee, Janu Hospitality shall pay liquidated damages to HJI within 30 days of termination.

32.     As a result of the termination of the License Agreement, Janu Hospitality is obligated to pay HJI liquidated damages in the amount of $65,000.00, as calculated pursuant to sections 12.1 and 18.4 of the License Agreement.

33.     Notwithstanding HJI's demand for payment, Janu Hospitality has failed to pay HJI the liquidated damages as required in sections 12.1 and 18.4 of the License Agreement.

34.     HJI has been damaged by Janu Hospitality's failure to pay liquidated damages.

**WHEREFORE**, HJI demands judgment against Janu Hospitality for liquidated damages in the amount of $65,000.00, together with interest, attorneys' fees, and costs of suit.

## THIRD COUNT

35.     HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 34 of the Complaint.

36.     By virtue of the premature termination of the License Agreement, HJI sustained a loss of future revenue over the remainder of the fifteen-year term of the License Agreement.

37.     If the Court determines that Janu Hospitality is not liable to pay HJI liquidated damages as required by sections 12.1 and 18.4 of the License Agreement then, in the alternative, Janu Hospitality is liable to HJI for actual damages for the premature termination of the License Agreement.

38.     HJI has been damaged by Janu Hospitality's breach of its obligation to operate a Howard Johnson® guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, HJI demands judgment against Janu Hospitality for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

39.     HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 38 of the Complaint.

40.     Pursuant to section 7, section 18.1, and Schedule C of the License Agreement, Janu Hospitality was obligated to remit Recurring Fees to HJI.

41.     Despite its obligation to do so, Janu Hospitality failed to remit certain of the Recurring Fees due and owing under the License Agreement, in the current amount of $40,109.19.

42.    Janu Hospitality's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged HJI.

**WHEREFORE**, HJI demands judgment against Janu Hospitality for the Recurring Fees due and owing under the License Agreement, in the current amount of $40,109.19, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

43.    HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 42 of the Complaint.

44.    At the time of the termination of the License Agreement, Janu Hospitality was obligated to pay HJI Recurring Fees.

45.    Despite its obligation to do so, Janu Hospitality failed to pay certain of the Recurring Fees due and owing under the License Agreement, in the current amount of $40,109.19.

46.    Janu Hospitality's failure to compensate HJI constitutes unjust enrichment and has damaged HJI.

**WHEREFORE**, HJI demands judgment against Janu Hospitality for the Recurring Fees due and owing under the License Agreement, in the current amount of $40,109.19, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

47.    HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 46 of the Complaint.

48.    Pursuant to the terms of the Guaranty, Hitesh Patel and Alka Patel agreed, among other things, that upon a default under the License Agreement, they would immediately make

each payment and perform each obligation required of Janu Hospitality under the License Agreement.

49.    Despite their obligation to do so, Hitesh Patel and Alka Patel have failed to make any payments or perform or cause Janu Hospitality to perform each obligation required under the License Agreement.

50.    Pursuant to the Guaranty, Hitesh Patel and Alka Patel are liable to HJI for Janu Hospitality's liquidated damages in the amount of $65,000.00, or actual damages in an amount to be determined at trial, and Janu Hospitality's Recurring Fees due and owing under the License Agreement, in the current amount of $40,109.19.

**WHEREFORE**, HJI demands judgment against Hitesh Patel and Alka Patel for all liquidated damages, or actual damages, and Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit.

> **LeClairRyan**
> Attorneys for Plaintiff,
> Howard Johnson International, Inc.
>
> By: _____
>    **BRYAN P. COUCH**

Dated: 6/9/17

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action

pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff,
Howard Johnson International, Inc.

By: _____

**BRYAN P. COUCH**

Dated: 6/9/17

# EXHIBIT A

Location: **BINGHAMTON, NY**
Entity No. 7 3 4 ᗡ ᗡ ᗡ -02
Unit No.: 23,842

## HOWARD JOHNSON INTERNATIONAL, INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated June 24, 2008, is between **HOWARD JOHNSON INTERNATIONAL, INC.**, a Delaware corporation ("we", "our" or "us"), and **JANU HOSPITALITY, INC.**, a NY corporation ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Howard Johnson" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a **"Howard Johnson Inn & Suites."** You may adopt addition or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. International Operators Council, Inc.** You are automatically a member of the INOC and are entitled to vote at its meetings on the basis of one Chain Facility, one vote. The purpose of the INOC will be to consider, discuss, and make recommendations on common issues relating to the operation of Chain Facilities. We will seek the advice and counsel of the INOC Board of Directors and its various committees. We will assist the INOC to function in a manner consistent with the best interests of the Chain, and to adopt its governing rules to be consistent with the best interests of the Chain.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the Facility no later than thirty (30) days after the Effective Date. The deadline for completing the pre-opening phase of conversion and renovation, when the Facility must score 200 or fewer points under our quality assurance inspection system (or equivalent score under a successor quality assurance scoring system we employ), and be ready to open for business under the System, is ninety (90) days after the Effective Date. All renovations will comply with System Standards, any Approved Plans and any Punch List attached to this Agreement. Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the pre-opening renovation specified on the Punch List and the Facility must pass its pre-opening quality assurance inspection with a score of 200 or fewer points (or equivalent score under a successor quality assurance scoring system we employ),

1

before we consider the Facility to be ready to open under the System. You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening or post-opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3.3 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. Time is of the essence for the Improvement Obligation. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. You will pay us a non-refundable extension fee of $2.00 per room for each day of any extension of the deadline for completing pre-opening improvements. This fee will be payable to us after each 30 days of the extension. You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date. The grant of an extension will not waive any other default existing at the time the extension is granted.

3.2  **Improvement Plans.** You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3  **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

3.4  **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will

HJEXCI
216531  03/07



be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual and follow standard industry practices for safeguarding cardholder information, including but not limited to, the Payment Card Industry Data Security Standard. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5 **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees and general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6 **Marketing.**

3.6.1 You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.2 You may participate in any regional marketing training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.6.3 You will participate in marketing programs approved by the INOC Board of Directors. These may require you to pay transaction or other fees to support guest rewards and other incentive programs.

3.6.4 The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs. You shall provide us with information and photographs of the Facility in

HJEXC1
216531 03/07



accordance with System Standards for posting on the Chain website. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

3.7  **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.8 **Financial Books & Records; Audits.**

3.8.1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2  Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

4

3.8.3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit.   Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.8 as described in Section 4.8 and/or other charges we identify and invoice as a result of the audit.  The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9  **Inspections.**  You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement.   You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice.  The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection.  We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score.  We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10  **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.  Unless we instruct you otherwise, your liability insurance policies will name Howard Johnson International, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their current and former affiliates, successors and assigns as additional insureds.

3.11  **Conferences.**   You or your representative and your general manager will attend each annual Chain conference and pay the Conference Fee we set for the Chain licensees, if and when we or the INOC Board of Directors hold an annual Chain conference.  Mandatory recurrent training for licensees and general managers described in Section 4.1.4 may be held at a

conference. The Fee we set will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference. You will pay one Conference Fee for each of the Chain Facilities you own.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve. You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Howard Johnson" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14 **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15 **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16 **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility was no more than 225 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

**4. Our Operating and Service Obligations.** We will provide you with the following services and assistance:

6

4.1  **Training.**  We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training.

4.1.1  **General Manager Orientation Training.**  We will offer at a location in the United States we designate a general manager orientation training program.  The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility.  We may also offer certain Internet-based training as a supplement to the classroom training experience.  Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date.  Any replacement general manager must complete general manager orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in general manager orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training.  We charge you tuition for general manager orientation which is payable before the scheduled date of the program.  The tuition for your first general manager is $1,250 if he/she attends orientation within the time period required under this section.  For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.  We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class.  If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 90 day period. We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation. This is in addition to the tuition you must pay us for your general manager at the then in effect rate when he/she attends orientation. See Section 4.1.5.

4.1.2  **Owner Orientation Training.**  We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.  If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date.  If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place.  Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 which is payable before the scheduled date for the program.  You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 90 day period.  We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation. See Section 4.1.5.

7

4.1.3   **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. This training may be offered at our corporate offices, at a regional location, on-line, or at the Facility. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. Tuition for remedial training must be paid before the training commences. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

4.1.4 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or other locations or held in conjunction with a Chain lodging conference. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5 **No Show and Cancellation Fees.** If you or your general manager fails to attend orientation within the required time period, or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a No-Show Fee of up to 100% of the tuition for the program. If you or any other member of your staff cancel participation in any training program less than 15 days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program as we establish from time to time. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2 **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the Room Sales Charge for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We may use Room Sales Charges we collect to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System.

4.3 **Marketing.**

4.3.1   We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training

programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion, after consultation with and the approval of the INOC Board of Directors: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from Marketing Contributions for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System licensees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs. We may require your participation in marketing programs approved by the INOC Board of Directors, and administer those programs on behalf of the INOC.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.3.4 We may use Marketing Contributions we collect to reimburse our reasonable direct and indirect costs, overhead and other expenses of providing marketing, training and related services.

4.4 **Purchasing and Other Services.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards. We may offer optional architectural and design services for the Facility for a separate fee.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances. We may change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation wherever it appears.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings

9

we conduct.  We will provide telephone and mail consultation on Facility operation and marketing through our representatives.  We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement.  We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications.  We will lend you one copy of the System Standards Manual promptly after we sign this Agreement.  We will send you any System Standards Manual revisions and/or supplements as and when issued.  We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8 **Inspections and Audits.**  We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection.  We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9.  You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.8.  We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis.  Our inspections are solely for the purposes of checking compliance with System Standards.

5. **Term.** The Term begins on the Effective Date and expires at the end of the fifteenth License Year.  Some of your duties and obligations will survive termination or expiration of this Agreement.  NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. **Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000.00.  You will pay us a non-refundable Initial Fee in the amount of **$10,000.00** when you sign this Agreement, which is fully earned when we sign this Agreement.

7. **Recurring Fees, Taxes and Interest.**

7.1    You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) ten days after the month in which they accrue, without billing or demand.  Recurring Fees are subject to Section 18 and include the following:

7.1.1  A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "Marketing Contribution" as set forth in Schedule C for advertising, promotion, training and other related services and programs, accrues from the Opening Date until the end of the Term. We may increase or adjust the Marketing Contribution or establish other marketing charges from time to time if either approved by the Board of Directors of the INOC or a

successor sanctioned as such by us or approved by a majority vote (which shall be counted on the basis of one Chain Facility, one vote) of INOC members in good standing, present and voting at a general membership meeting or at a special meeting called for the purpose of considering the change in the Contribution by the INOC Board of Directors and upon at least 15 days' notice from us.

7.1.3  A "Room Sales Charge" as set forth in Schedule C as well as such other Reservation System Charges as we establish from time to time, accrues from the Opening Date until the end of the Term, including during suspension periods. We may increase or adjust such Room Sales Charge on a Chain-wide basis, upon 60 days written notice to Licensees, to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs. You will also pay or reimburse us for commissions we pay to travel and other agents for certain reservations at the Facility, for incentives we pay to other Chain Facilities or their employees for booking reservations at your Facility, and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula.

7.2  You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State. You will pay Taxes to us when due.

7.3  **"Interest"** is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4  If a **Transfer** occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

## 8. Indemnifications.

8.1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in

11



willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3  We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1  **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2  **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national

12

securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3  **Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions.  If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine.  We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us.  We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date.  Such payment would be due and payable when you transfer possession of the Facility.  We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise.  Our consent to the transaction will not be effective until these conditions are satisfied.

9.4  **Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee.  No Transfer will be deemed to occur.  You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6.  Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees.  No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement.  You must comply with this Section if you transfer the Facility to a Permitted Transferee.  A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5  **Attempted Transfers.**  Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us.  You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6  **Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction.  You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility.  We will respond to all requests for our consent and notices of Permitted Transferee transactions

13

within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, you must act diligently to cure the default and resolve health, safety, cleanliness and housekeeping failures identified in the inspection report within 30 days after the failing inspection. Within 90 days after the failing inspection, you must also cure the remaining items identified in the inspection report and renovate and improve the Facility to meet our then current System Standards for entering conversion properties (or other standards specified under System Standards if we are not then accepting conversions) to cure the default. At your request, we will determine and provide a written improvement plan to assist your efforts to cure the default.

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Howard Johnson", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us,

14

(9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

## 11.3  Casualty and Condemnation.

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available.  You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations.  You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty.  This restoration will be completed within 180 days after the Casualty.  You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first.  If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

## 11.4  Our Other Remedies.   We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default.  All Room Sales Charges accrue during the suspension period.  We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards.  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform.  We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration.  We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory.  You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief.  We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice.  Our consent or approval may be withheld if needed

15

while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

**11.5  Your Remedies.**  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12.  Liquidated Damages.

**12.1    Generally.**  If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties, Marketing Contributions and Room Sales Charges during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less). If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties, Marketing Contributions and Room Sales Charges since the Opening Date multiplied by 24. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

**12.2  Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Recurring Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

**13.  Your Duties At and After Termination.**  When the License or this Agreement terminates for any reason whatsoever:

.16

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Howard Johnson", including Room Sales Charges for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.** **Your Representations and Warranties.** You expressly represent and warrant to us as follows:

14.1 **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the

HJEXC1
216531 03/07

Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2  **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement.  You have obtained all necessary approvals of your owners, Board of Directors and lenders.  No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement.  Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject.  Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application.  You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.  To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3  **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15.  Proprietary Rights.

15.1  **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2  **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  No good will shall attach to any secondary designator that you use.

18

15.3  **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory described in Section 17.8.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4  **Confidential Information.**  You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5  **Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.  We alone handle disputes with third parties concerning use of all or any part of the System.  You will cooperate with our efforts to resolve these disputes.  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6  **The Internet.**  You may use the Internet to market the Facility subject to this Agreement and System Standards.  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent.  You will assign to us any such identification at our request without compensation or consideration.  You must make available

19

through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

**16. Relationship of Parties.**

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

**17. Legal Matters.**

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or be establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3 **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt

20

requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below.  The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Howard Johnson International, Inc.:
Our address:  1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No. (973) 496-5359

Your name: Janu Hospitality, Inc.
Your address: 1156 Upper Front Street, Binghamton, NY 13905
Attention: Hitesh Patel
Your fax No.: 607-722-1823

17.4  **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5  **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

17.6  **Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc.  We will provide you with the contact address for that organization.  The mediation will be conducted by a mutually acceptable and neutral third party.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

HJEXCI
216531  03/07

**17.6.4 WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.7  Special Acknowledgments.** You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.

**17.7.1** You received our UFOC for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

**17.7.2** Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

**17.7.3** This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

**17.7.4** You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

**17.7.5** You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

17.8  <u>Protected Territory</u>. We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility, or (ii) operate a time share resort, vacation club, vacation ownership interval ownership program, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied

territorial rights or agreements between the parties except as stated in this Section. By electing to include this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **the area within a circle created by a five mile radius whose center point is the front door of the Facility.**

**18.    Special Stipulations.**    The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

**18.1.    Special Combined Fees.**    Notwithstanding Section 7.1, you will pay a "Combined Fee," consisting of the Royalty and the Room Sales Charge and the Marketing Contribution (excluding commissions and related service charges, Internet fees, the Loyalty Program Charge, service fees and charges, guest reward and affinity program fees, guest complaint assessments, GDS Fees and similar fees and charges described in Schedule C) to us at the rates set forth in this Section, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement:**

18.1.1  The Combined Fee shall be six and one half percent (6.5%) of Gross Room Revenues accruing during the first, second and third License Years; and

18.1.2 The Combined Fee shall be seven and one half percent (7.5%) of Gross Room Revenues accruing during the fourth and fifth License Years; and

18.1.3 The Royalty, Marketing Contribution and the Room Sales Charge shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the fifth License Year.

18.1.4   The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Combined Fee shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 200 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of less than 200 in a re-inspection to be performed not less than 60 days after the initial inspection.

**18.2  Prior Affiliation.** Notwithstanding anything to the contrary, you agree that, prior to the Opening Date, you will provide us with a copy of the written termination notice or other written

23



evidence satisfactory to us in our sole discretion that any prior hotel affiliation has terminated before we will cause the Opening Date to occur. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if you do not provide satisfactory proof of termination of the prior hotel affiliation prior to the Opening Date.

18. 3    Each of us has the right to terminate this Agreement, without cause, and as a matter of right, on the seventh or twelfth anniversaries of the Opening Date, by giving prior written notice to the other, provided, that if you decide to exercise your right to terminate this Agreement, you must have paid all fees and charges due under this Agreement (and all related agreements, including any promissory notes or other incentive agreements, and any agreements relating to the use of a property management system or Reservation System) as of the date you provide notice of termination and as of the effective date of the termination. The written notice required by this Section shall be given at least 6 months, but not more than twelve (12) months, before the date of the proposed termination. You will pay no Liquidated Damages if you comply with the terms of this Section and you perform the post termination obligations specified in this Agreement.

18.4    **Liquidated Damages.**    Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two Franchise Years will be One Thousand Dollars ($1,000.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

18.5    **Reduced Relicense Fee.**    If (i) you are not then in default under this Agreement, (ii) we receive your proposed transferee's Franchise Application and Application Fee before you Transfer the Facility, and (iii) we receive the Franchise Application before the end of the third Franchise Year, then the Relicense Fee for a Transfer will be $10,000.00. If the conditions are not satisfied, and after the third Franchise Year, the Relicense Fee will be as specified in Section 7.4.


REMAINING PORTION OF THE PAGE INTENTIONALLY LEFT BLANK



HJEXC1
216531 03/07

IN WITNESS WHEREOF, the parties have executed this Agreement on this $24$ day of
$\underline{June}$ , 20$\underline{08}$ and agree to be bound by the terms and conditions of this Agreement as of
the Effective Date.

**WE:**
**HOWARD JOHNSON INTERNATIONAL, INC.**


By: _____
        Vice President


**YOU,** as licensee:
**JANU HOSPITALITY, INC.**


By: _____
        **(Vice) President**

24

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their licensees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Howard Johnson facilities located outside the United States, Canada and Mexico.

25

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

IIJEXCI
216531 03/07



Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

INOC means the International Operators' Council, Inc., a Georgia non-profit corporation, its successors and assigns as the official organization of Chain licensees.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means:

(i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **1156 Upper Front Street, Binghamton, NY 13905**, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

HJEXCI
216531 03/07



Marketing Contribution means the fee you pay to us under Section 7.1.2 and Schedule C, as amended, for advertising, marketing, training and other services.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Howard Johnson" and other marks (U.S. Reg. Nos. 1,506,553; 714,495; 836,077; 1,506,552; 1,385,515; and 1,530,295) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, Marketing Contributions, Room Sales Charges, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

28

Reservation System  or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Room Sales Charge means the fees set forth in Section 7.1.3 and Schedule C, as modified in accordance with this Agreement for reservation services and other charges.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including  Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual, and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

HJEXCI
216531 03/07

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Howard Johnson International, Inc., a Delaware corporation, its successors and assigns.

30

## SCHEDULE A

(Legal Description of Facility)

HJEXC1
216531  03/07

1156 FRONT STREET, LLC, a Limited Liability Company, organized and doing business in the State of New York, 1156 Front Street, Binghamton, NY 13901

party of the second part,

WITNESSETH that the party of the first part, in consideration of        ONE DOLLAR ($1.00 + og&vc) lawful money of the United States, plus other good and valuable consideration paid by the part       of the second part, do hereby grant and release unto the part       of the second part, his/her/their heirs, successors and assigns forever,

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of Chenango, County of Broome and State of New York bounded and described as follows: Commencing at an iron pin in the easterly boundary of Front Street, also known as Broome County Highway No. 126, which iron pin is N 36° 16' 54" E a distance of 682.90 feet from a nail set at the intersection of the center lines of Norton Drive and Front Street.

Thence continuing along the easterly boundary of Front Street N 36° 39' 56" E a distance of 10 feet to an iron pin; thence S 53° 16' 00" E a distance of 158.33 feet to a rebar; thence S 81° 49' 00" E a distance of 54.30 feet to a spike; thence N 36° 39' 00" E a distance of 143.23 feet to a rebar; thence N 76° 12' 00" W a distance of 151.92 feet to a rebar; thence N 53° 16' 00" W a distance of 66.24 feet to a point in the easterly boundary of Front Street (Broome County Highway No. 126); thence along the easterly highway boundary of said Front Street the following courses and distances: (1) N 37° 01' 23" E, a distance of 10.53' to a rebar

(2) N 36° 23' 54" E, a distance of 49.79' to a rebar
(3) N 37° 57' 37" E, a distance of 55.51' to a rebar
(4) N 35° 50' 57" E, a distance of 52.87' to a rebar
(5) N 36° 24' 37" E, a distance of 36.02' to a rebar;
thence S 81° 35' 18" E a distance of 319.02 feet to an iron pipe; thence S 10° 31' 42" W a distance of 175.50 feet to a point; thence S 32° 37' 23" W a distance of 319.39 feet to an iron pin; thence N 53° 16' 00" W a distance of 164.64 feet to an iron pipe; thence continuing on the same course a distance of 216.17 feet to the point or place of beginning; being 2.768 acres according to a survey of Paul B. Koerts, P.L.S, dated December 5, 2005.

BEING the same premises conveyed to W and R, Inc. by Deed of Arvind Thakkar, Rasila A. Thakkar, Hasmukh C. Amin and Achala H. Amin dated August 22, 2003 and recorded in the Broome County Clerk's Office on August 23, 2003 in Book 2043 of Deeds at Page 1.

## SCHEDULE B

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|---------------------|------------------------|---------------------|
| **Hitesh Patel** | **50%** | **common stock** | |
| **Alka Patel** | **50%** | **common stock** | |

PART II:        THE FACILITY:

   Primary designation of Facility: Howard Johnson **Inn & Suites**

   Number of approved guest rooms: **65**

   Parking facilities (number of spaces, description): **65**

   Other amenities, services and facilities:

PART III:        DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
                 COMPLETED AS THE IMPROVEMENT OBLIGATION:

### [Punch List to be attached.]


Initial

33

NY Binghamton Quality Inn & Suites CV HJ

Tier: Inn & Suites



*Howard Johnson®*

Howard Johnson International, Inc.
Punchlist for Conversion
"Schedule B Part III"
November 14, 2007
Revised on June 13, 2008

## OWNER APPLICANT

| | |
|---|---|
| Property Name: | Quality Inn & Suites |
| Property Address: | 1156 Upper Front Street |
| City: | Binghamton   St:NY   Zip:13905 |
| Conversion Consultant: | Jerry James Clarke |
| Owner/Applicant: | Hitesh Patel |
| Phone: | (201) 214-4369 |
| Salesperson: | Brian Krause |
| Phone: | (973) 229-4310 |

## ROOM DIMENSIONS - EXISTING

| | | | | | GUESTROOMS | |
|---|---|---|---|---|---|---|
| # of Rms 3 | 22 | (width) x 26 | (length) = 572.00 sq. ft. | TOTAL ROOMS: | 65 | |
| # of Rms 5 | 14 | (width) x 20 | (length) = 280.00 sq. ft. | Rentable | 65 | |
| # of Rms 5 | 13 | (width) x 44 | (length) = 572.00 sq. ft. | | | |
| # of Rms 52 | 13 | (width) x 22 | (length) = 286.00 sq. ft. | Doubles | 48 | |
| # of Rms | | (width) x | (length) = | sq. ft. | Singles | 5 |
| # of Rms | | (width) x | (length) = | sq. ft. | Suites | 5 |
| | | | | | Kings | 7 |

ROOM DIMENSION STANDARD: 288 SF

## PROPERTY CONDITION SUMMARY

This approximately 25-year-old property consists of a 2-story, L-shaped, interior-corridor building constructed of concrete block with a concrete block, split block and wood exterior finish and pitched roof. The property replaced casegoods packages and bedding in July 2007. Property will require exterior, public area and guestroom/bath area renovations to comply with System Standards. Upgrading of landscaping will be required to enhance curb appeal.

The property is located of of I-81 at exit 6 in Binghamton, NY. Clientele consists of a mix of commercial and leisure business.

## PUBLIC AREA DIMENSIONS - EXISTING

| | | | STANDARD | PUBLIC AREA DIMENSIONS - EXISTING | | STANDARD |
|---|---|---|---|---|---|---|
| Lobby | 64 | (width) x 18 | (length) = 1152.0 sq. ft. | 800 SF | (width) x | (length) = sq. ft. | |
| Breakfast Area | 22 | (width) x 26 | (length) = 572.00 sq. ft. | N/A | (width) x | (length) = sq. ft. | |
| Meeting Room | 22 | (width) x 44 | (length) = 968.00 sq. ft. | N/A | (width) x | (length) = sq. ft. | |

## BRAND VARIANCES

All items in this punchlist are required to be completed no later than 90 days of opening, unless otherwise noted. Time extensions in no way imply a waiver. All items will continue to be evaluated on condition, appearance and adherence to System Standards.

ONLY THE FRANCHISOR MAY REVISE THIS PUNCHLIST. PUNCHLIST VOID 180 DAYS AFTER INSPECTION DATE UNLESS FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE.

This Punchlist identifies actions needed to cause the Facility to meet the Franchisor's standards. You are solely responsible for compliance of the Facility with applicable federal, state and local laws, codes, ordinances and regulations.

You have been provided a Punchlist Reference Guide to assist in compliance with punchlist completion and Brand Standards.

This Punchlist was based on a random sample inspection of the Facility on the date specified. You may need to take additional actions to meet our Standards, or comply with law, or at our discretion if we modify our Standards or the condition of the Facility changes materially after the inspection date.

The Franchise Review Committee may in its discretion revise this Punchlist as a condition of approving your application.

You should not consider this Punchlist to be final until we sign the License of Franchise Agreement.

Revisions-All Previous Copies are Invalid

| | flip BAY to | JJC |
|---|---|---|
| | HJS | |
| Signed: _____ | 03/03/2008 | ae/sg |
| Date: 6-13-08 | 06/13/2008 | tg/kr |
| Print Name: HITESH PATEL | 06/13/2008 | sg |

Quality Assurance

Initials: [initials]

PUCB2

NY Binghamton Quality Inn & Suites CV HJ

P    2    of 9

## Brand Variances Continued

| | For Office Use Onl. |
|---|---|
| One oversized guestroom chair/recliner is acceptable in lieu of the required two occasional chairs in single bedded rooms. | |
| The existing ceramic walltiles in public restroom are acceptable until "Moderate" on any future Quality Assurance evaluation. Upon replacement, wallcovering meeting current System Standards are required. | |
| The parking lot is acceptable until condition grades a "Moderate" on any future Quality Assurance Evaluation. Upon repair, total resurfacing, resealing and restriping is required. | |
| The existing stone accent wall in lobby and breakfast areas are acceptable if condition is maintained. | |
| Vending machines in lobby and breakfast area are acceptable. | |
| The existing split block accent walls in corridors and guest laundry to include lobby vestibule columns are acceptable if condition is maintained. | |
| The existing painted paneling in exercise room and game room is acceptable if condition is maintained. | |
| Existing wainscoting in meeting room is acceptable if condition is maintained. | |
| The existing showerheads are acceptable until condition grades a "Moderate" on any future Quality Assurance evaluation. Upon replacement, Glacier Bay massage shower heads are required. | |
| Existing 24" television units are acceptable until condition grades a "Moderate" on any future Quality Assurance Evaluation. Upon replacement, minimum 27" units per System Standards are required. | |
| | |
| | |
| | |
| | |

Produced using ACI software, 800.234.8727 www.acreate.com

Quality Assurance

Initials: ___    ITCPOTH

NY Binghamton Quality Inn & Suites CV HJ

| COMPLETION DATE | EXTERIOR SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Provide Company approved signage.  Contact the Brand Identity Department at (973) 753-7251 for assistance. | |
| **Prior to opening** | Paint sign stanchions per System Standards.  Contact the Brand Identity Department for assistance. | |
| No later than November 1, 2008 | Remove non-compliant "Entrance" sign at main lobby entrance. | |
| No later than November 1, 2008 | Exterior renovation plans must be approved prior to commencement of work through written approval by Design Services at (877) WHG-1515. At a minimum, plans should include a porte cochere design feature and installation of an approved exterior insulated finish system (to conceal concrete block), etc. | |
| No later than November 1, 2008 | Incorporate a Company design feature into the porte cochere. | |
| No later than November 1, 2008 | Install a new exterior finish system such as stucco, synthetic stucco or similar to conceal concrete block (i.e. above and around windows).  Installation of siding to match is an acceptable option. | |
| No later than November 1, 2008 | Repair and paint wood facade, roofline accents and window accents to include all trim work.  Contact Design Services for approved color schemes. | |
| No later than November 1, 2008 | Pressure wash split concrete block facade to remove stains and discoloration. | |
| No later than November 1, 2008 | Pressure wash roofing shingles to remove surface stains and discoloration.  Replace/provide shingles where damaged or missing.  Ensure all tiles match in style, color and texture or total replacement will be required. | |
| No later than November 1, 2008 | Replace/provide roofline gutter system where damaged/missing. | |
| No later than November 1, 2008 | Repair/remove non-accessible/functional staircase adjacent to main entrance and refinish area to a like-new condition. | |
| No later than November 1, 2008 | Replace all building lights with upgraded fixtures that complement building exterior. | |
| No later than November 1, 2008 | Paint ceiling at south corridor entrance canopy/vestibule and provide appropriate cover over light fixture. | |
| Prior to opening | Replace trash receptacles at south corridor entrance and main lobby entrance. | |

Produced using ACI software, 800.234.8727 www.aciweb.com

Quality Assurance

NY Binghamton Quality Inn & Suites CV HJ

| EXTERIOR | |
|---|---|
| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
| No later than November 1, 2008 | Repair/repour concrete walkway at south corridor entrance and replace floor mats. | |
| 90 days after opening | Replace or paint rusted vent pipe on east side of building. | |
| 90 days after opening | Pressure wash and seal concrete driveway at porte cochere to eliminate stains. | |
| No later than Janauary 1, 2009 | Replace privacy strips on Dumpster enclosure with a light, neutral color. | |
| No later than August 1, 2008 | Eliminate weeds from existing landscaped areas. Manicure/prune greenery (trees, shrubs, bushes) at building perimeter and main driveway entrance. Provide additional ground cover (mulch, rock, bark ) in all landscaped areas. Maintain landscaping on a routine basis. See landscaping samples FP-3, OP-4 and IS-5 in the Punchlist Reference Guide. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Initials:

Produced using AG3 software, 800.234.4707 www.aimweb.com

Quality Assurance

PLGTEXT

NY Binghamton Quality Inn & Suites CV HJ

Page: 5   of: 9

| COMPLETION DATE | PUBLIC AREAS SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| Prior to opening | Provide a property management system per System Standards. | |
| 90 days after opening | All owners/general managers are required to attend all Brand orientation/training. | |
| 90 days after opening | Property manager is required to be TripRewards certified and property must comply with all TripRewards requirements. | |
| Prior to opening | Provide a voicemail system, complimentary USA Today® newspapers and wireless, complimentary high-speed Internet access in both the lobby and breakfast areas. | |
| Prior to opening | Provide a Rise & Dine breakfast per System Standards. | |
| Prior to opening | Provide flammable storage per System Standards. | |
| 90 days after opening | Replace directional signage package in all public areas to include room number plaques. A professionally printed/approved signage package is required. | |
| Within timeframes noted | Professionally clean carpet in lobby, corridors and meeting room prior to opening with total replacement no later than 12 months after opening. | |
| 90 days after opening | Deep clean, regrout and seal ceramic tile flooring in lobby, breakfast area, public restrooms, corridors and vending areas to include hallway to exercise room and game room. | |
| 90 days after opening | Replace floor mats in lobby and hallway to exercise room and game room. | |
| Within timeframes noted | Remove non-compliant lobby signage (Quality Inn & Suites and Royal Suites & Apartments) and repair affected areas to like new condition prior to opening. Replace/install new wallcovering in lobby, breakfast area, corridors and meeting room no later than December 31, 2008. | |
| | Replace/remove lobby vestibule message board. Smooth painted accent walls as in breakfast area are not acceptable. | |
| 90 days after opening | Replace ceiling tiles in all public areas where stained and/or discolored. Ensure all replacements match existing tiles in style, color and texture. If replacements do not match, total replacement will be required. | |

Quality Assurance

Produced using ACI software, 856.254.6727 www.aciweb.com

Initials: _____   PLCP5A

NY Binghamton Quality Inn & Suites CV HJ

## PUBLIC AREAS

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| 90 days after opening | Provide window dressings in lobby, breakfast area and corridors. Recommend draperies with sheers, blinds with a fabric upholstered cornice, valances, etc. to enhance decor. | |
| 90 days after opening | Replace lobby seating package to include tables. | |
| 90 days after opening | Refinish registration desk to a like-new condition. | |
| 90 days after opening | Remove advance reservations kiosk from lobby area. | |
| 90 days after opening | Replace vanities in all public restroom vanities to include cabinetry. Remove domestic style liquid hand soap in all public restrooms. Wall-mounted soap dispensers are required. | |
| 90 days after opening | Install vanity lighting in all public restrooms. | |
| 90 days after opening | Remove toilet seat/lid units in all public restrooms. An open face toilet seat only is required in public facilities; lids are not acceptable. | |
| 90 days after opening | Paint entrance doors to all public restrooms. | |
| December 31, 2008 | Replace breakfast area counters/cabinetry. | |
| 90 days after opening | Provide a minimum 25" television in the breakfast area enclosed in professionally crafted millwork unless a wall-mounted flat panel television is provided. | |
| 90 days after opening | **Professionally clean breakfast chairs. If condition cannot be restored, replacement will be required. Breakfast tables are required to be the same wood finish as the existing chairs or tables are required to be covered with cloth table cloths.** | |
| 90 days after opening | Replace trash receptacle in breakfast area. | |
| 90 days after opening | Paint doors and frames in corridors and stairwells (elevator, service and guestroom). | |
| 90 days after opening | Replace stairtreads in stairwells. | |

Produced using ACI software, 800.234.4722 www.ezhotel.com

Quality Assurance

Initials: [signature]

PLCRPA

NY Binghamton Quality Inn & Suites CV HJ

## PUBLIC AREAS

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| December 31, 2008 | Replace ceramic tile flooring in guest laundry. | |
| 90 days after opening | Deep clean and seal ceramic tile walls in guest laundry. | |
| 90 days after opening | Remove furniture in guest laundry. | |
| Within timeframes noted | **Professionally clean flooring in exercise room and game room prior to opening with flooring replacement to be completed no later than December 31, 2008. A surface designed for commercial traffic is required.** | |
| 90 days after opening | Paint walls in exercise room. | |
| 90 days after opening | All exercise equipment must be maintained and inspected as per the manufacturer guidelines and emergency instructions, assumed liability signage and guest use only signage must be prominently displayed in the exercise room. | |
| 90 days after opening | Replace window dressings in meeting room with decorative 100% blackout draperies. | |
| 90 days after opening | Replace framed wall mirrors in meeting room with decorative artwork that complements decor. | |
| 90 days after opening | Replace white/eraser board in meeting room. | |
| 90 days after opening | Replace/remove podium in meeting room. | |
| 90 days after opening | Professionally clean meeting room chairs to eliminate stains. If stains remain, replacement will be required. | |
| | | |
| | | |
| | | |

Produced using ACT software, 800.234.4177 www.actweb.com

Quality Assurance

Initials: _____

RCPPA

## GUESTROOMS

**ROOMS INSPECTED:** 102, 104, 232, 236, 227, 225, 220, 222, 237

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| Prior to opening | Facilities to assist the handicapped in accordance with local, state and federal codes, regulations and ordinances are required. | |
| 90 days after opening | Provide complimentary high-speed Internet access, pedestal mounted safes, hairdryers, AM/FM alarm clock radios, coffee makers, irons with full size boards, full-length mirrors, UL trashcans, data port telephones and all required supplies. 60% of guestrooms must be designated as non-smoking. | |
| 90 days after opening | A premium movie channel, a news channel, sports channel and major network channels are required. | |
| 90 days after opening | **Provide Arcs and Angles flat curved shower rods and Arcs and Angles "Major" Hookless® shower curtains.** | |
| 90 days after opening | Provide all suite FF&E and supplies as noted in the Punchlist Reference Guide. | |
| 90 days after opening | Removal of all previous affiliation guestroom supplies is required. | |
| Prior to opening | Remove secondary deadbolt lock on entrance doors and install flush plates to conceal openings. | |
| Prior to opening | **Replace entrance door electronic lock casings where damaged or tarnished.** | |
| Prior to opening | Replace hollow core connecting room doors as in room #102 with solid core doors. Replace connecting door locks per System Standards. | |
| No later than December 31, 2009 | **Replace ceiling tiles to include bath areas where stained or discolored as in room #227. Ensure all replacements match existing tiles in style, color and texture. If replacements do not match total replacement will be required.** | |
| 90 days after opening | **Repair/paint balance of solid ceilings where patched as in room #236 to provide a consistent appearance.** | |
| 90 days after opening | Replace discolored ceiling lights as in room #236. | |
| No later than March 31, 2009 | Replace wallcovering. Painted wall vinyl is not acceptable. | |
| No later than March 31, 2009 | Replace brass-framed artwork. The newer wood-framed artwork is acceptable. | |

NY Binghamton Quality Inn & Suites CV HJ

**GUESTROOMS**

ROOMS INSPECTED 102, 104, 232, 236, 227, 225, 220, 222, 237

| COMPLETION DATE | SCOPE OF WORK | For Office Use Only |
|---|---|---|
| No later than March 31, 2009 | **Replace carpet except where newer.** | |
| | **Replace worn sheet vinyl flooring in kitchenette area.** | |
| 90 days after opening | Provide coordinating occasional/leisure chairs where missing as in rooms #102 and #104. | |
| No later than March 31, 2009 | Replace lamp packages. | |
| 90 days after opening | Replace pillows to meet Howard Johnson upgraded Gold Label pillow specifications. | |
| 90 days after opening | Replace draperies except where newer as in room #102. | |
| 90 days after opening | All bedsets (mattresses/boxsprings) that have reached an age of seven years or older or exceeded a "Moderate" conditional level must be replaced with the approved Serta or Simmons bedsets per Howard Johnson specifications. | |
| No later than March 31, 2009 | Replace secondary guestroom vanity/cabinetry as in room #236.  Laminate finishes are not acceptable.  Removal of vanity/sink units is an acceptable option. | |
| No later than March 31, 2009 | Replace vanity lighting.  A new decorative fixture is required (incandescent or fluorescent lighting is acceptable).  Fixture must be wall mounted over the vanity area. | |
| Prior to opening | Install a GFCI outlet in all vanity areas. | |
| 90 days after opening | Complete replacement of 2" ceramic tile bathroom flooring with 12" tiles. | |
| 90 days after opening | Replace plumbing fixtures/trim (sinks and tubs) where tarnished (faucets, drain rings, etc.) as in room #104.  Provide chrome stoppers where missing.  Rubber stoppers are not acceptable. | |
| 90 days after opening | Replace bathtubs where worn as in room #104. The installation of commercial grade liners or professionally restoring surfaces to like-new condition are acceptable alternatives. | |
| December 31, 2008 | Replace blue shower stall and toilet unit in kitchenette room #237 with white. | |
| | · | |

Produced using ACI Software, 800.234.4727 www.aciweb.com

Quality Assurance

Initials: _____

**HOWARD JOHNSON INTERNATIONAL, INC.**
**SCHEDULE C**
**October 2007**

A.    Marketing Contribution

The Marketing Contribution is 2% of Gross Room Revenues. We may increase or adjust such Marketing Contribution from time to time if either approved by the Board of Directors of the INOC or its successor sanctioned as such by us or approved by a majority vote (which shall be counted on the basis of one Facility, one vote) of INOC members in good standing, present and voting at a general membership meeting or at a special meeting called for that purpose by the Board of Directors upon at least 15 days' notice from us.

B.    Guest Loyalty Marketing Fee

We charge a Guest Loyalty Marketing Fee for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Guest Loyalty Marketing Fee is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

C.    Room Sales Charge

The Room Sales Charge is 2.5% of Gross Room Revenues. Notwithstanding the above, we may change the Room Sales Charge on a Chain-wide basis, after 60 days written notice to licensees, to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs.

D.    GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. The GDS Fee described in Section 7 is $5.15 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $4.15 per reservation booked through sources other than GDS powered websites, our Chain website, or our direct connection to expedia.com or hotels.com. We do not charge any fees for reservations booked through our Chain website or through our direct connection to expedia.com or hotels.com. GDS and Internet-originated reservations also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

HJEXCI
216531 03/07



E.    Additional System Assessment or Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .5% of commissionable revenue. Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission. The "property to property" incentive sales commission is 10% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System, plus our service charge of .75% of commissionable revenue.

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services. By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf or for Chain Facilities to participate in their programs.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning June 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $60 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. We will allocate these commissions to our Royalty and Marketing Contribution accounts in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

34

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

F.    Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not resolve any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $100.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the Board of Directors of the INOC, we will charge you a "Processing Fee" of $60.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the INOC Board. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

HJEXC1
216531  03/07

## GUARANTY

To induce HOWARD JOHNSON INTERNATIONAL, INC., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

_____ (Seal)
HITESH PATEL

_____ (Seal)
ALKA PATEL

36

HJEXC1
216531  03/07

Jun 24 2008 12:17PM   HP LASERJET FAX                                    P.2

## GUARANTY

To induce HOWARD JOHNSON INTERNATIONAL, INC., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

GUARANTORS:

_____ (Seal)
HITESH PATEL

_____ (Seal)
ALKA PATEL

36

HJEXC1
216531 03/07

# EXHIBIT B

## GUARANTY

To induce HOWARD JOHNSON INTERNATIONAL, INC., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments,   will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement.  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee.  We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

_____ (Seal)
HITESH PATEL

_____ (Seal)
ALKA PATEL

36

HJEXCI
216531 03/07

## GUARANTY

To induce HOWARD JOHNSON INTERNATIONAL, INC., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

GUARANTORS:

_____ (Seal)
HITESH PATEL

_____ (Seal)
ALKA PATEL

HJEXC1
716531 01/07

# EXHIBIT C



# WYNDHAM
### HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

February 23, 2017

**VIA 2 DAY DELIVERY METHOD**

Mr. Hitesh Patel
Janu Hospitality, Inc.
1156 Front Street
Binghamton, NY 13905

RE:    ACKNOWLEDGMENT OF TERMINATION of the License Agreement for Howard Johnson®
       System Unit #23892-73426-2 located in Binghamton, NY (the "Facility")

Dear Mr. Patel:

Howard Johnson International, Inc. ("we" or "us") has received a letter from Alka Patel, dated December 17, 2016, advising us that on January 1, 2017 (the "Termination Date"), Janu Hospitality, Inc. ("you" or "your") would stop operating the Facility as a Howard Johnson facility. Accordingly, we acknowledge that the License Agreement, dated June 24, 2008 (the "Agreement"), has terminated.

The Agreement requires you to perform certain post-termination obligations.  In addition to other obligations specified in the Agreement, by no later than ten (10) days from the delivery date of this letter, you must (a) remove all signage and other items bearing the Howard Johnson Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Howard Johnson facility; and (d) remove the Howard Johnson Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines.  You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified.  You must immediately return to us all training documents, operating manuals and other proprietary material.

Because the Agreement has terminated, you must pay us Liquidated Damages of $65,000.00, as specified in Section 18.4 of the Agreement.  You must also pay any outstanding Recurring Fees and any other fees and charges through the date you complete the de-identification of the Facility.  We estimate that, as of the Termination Date, you owe us $36,087.01 in such fees and charges.  Please pay us this amount within fourteen (14) days.  Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantor.

Please know that, because the Agreement has terminated, you  also have lost the right to continue to use the seamless interface version of your property management system.  You must now make arrangements with the software vendor for a new license to use the property management system.  If the Facility has WynGuest system installed, please be advised that due to the termination you will have no functionality from the system. Should you wish to continue using an independent version of the software, please contact Sabre at 877-520-3646. If your property is planning to migrate to another property management system, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 506-646-2521 to obtain reporting of that data.

*Certified Mail Tracking #
7014 2120 0000 8405 4035*

    

     

Mr. Hitesh Patel
February 23, 2017
Page Two


Should you have any questions regarding this matter, please contact Charlene Martin, Senior Manager of Settlements, at (973) 753-7602.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosures

cc:    Alka Patel (Guarantor)
       Visions Federal Credit Union (Lender) – P.O. Box 419, Endicott, NY 13761-0419 (Via Certified Mail)
       Cynthia Liu
       Charlene Martin
       Michael Piccola
       Joe Maida

# ITEMIZED STATEMENT

Report Date: 09-Jan-2017

*Howard Johnson*

| As of Date (DD-MMM-YYYY) | : | 01-Jan-2017 |
|---|---|---|
| Customer No | : | 23892-73426-02-HOJ |
| Category Set | : | |
| Category Group | : | |
| Group No | : | No Bankruptcy Sites |
| Disputed | : | No |
| Finance Charges Included | : | Yes |
| | | |
| Customer No | : | 23892-73426-02-HOJ |
| Address | : | 1156 Upper Front St.BINGHAMTON,NY,13905-1119,US |
| As of Date | : | 01-Jan-2017 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| AUG-2015 | 10832896 | 08/19/2015 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 1.68 | 161.68 |
| | 10833475 | 08/19/2015 | GUEST SATISFACTION | | 57.69 | 0.00 | 0.61 | 58.30 |
| | | | Sub Total: | | 217.69 | 0.00 | 2.29 | 219.98 |
| SEP-2015 | 100025 | 09/28/2015 | RETRAINFEE-SEP2015-0 | | 250.00 | 0.00 | 20.49 | 270.49 |
| | 31065845 | 09/28/2015 | ONLINE LRNG LIBRARY | | 60.00 | 0.00 | 3.12 | 63.12 |
| | | | Sub Total: | | 310.00 | 0.00 | 23.61 | 333.61 |
| OCT-2015 | 10845956 | 09/30/2015 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 19.17 | 179.17 |
| | 10846791 | 09/20/2015 | GUEST SATISFACTION | | 45.00 | 0.00 | 5.08 | 50.08 |
| | 10847924 | 10/07/2015 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 23.74 | 183.74 |
| | 10848885 | 10/07/2015 | GUEST SATISFACTION | | 115.23 | 0.00 | 17.84 | 133.07 |
| | 31078046 | 10/26/2015 | Jun 2015 NT Audit | | 78.28 | 0.00 | 12.46 | 90.74 |
| | 31078170 | 10/26/2015 | Jun 2015 NT Audit | | 69.58 | 0.00 | 11.10 | 80.68 |
| | | | Sub Total: | | 628.09 | 0.00 | 89.39 | 717.48 |
| NOV-2015 | 100471 | 11/29/2015 | RETRAINFEE-NOV2015-0 | | 250.00 | 0.00 | 43.29 | 293.29 |
| | 10854573 | 11/03/2015 | GUEST SATISFACTION | | 180.00 | 0.00 | 33.48 | 213.48 |
| | 10854735 | 11/03/2015 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 27.15 | 187.15 |
| | | | Sub Total: | | 590.00 | 0.00 | 103.92 | 693.92 |
| DEC-2015 | 100690 | 12/30/2015 | RETRAINFEE-DEC2015-0 | | 250.00 | 0.00 | 39.41 | 289.41 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Sub Total: | 250.00 | 0.00 | 39.41 | 289.41 |
| JAN-2016 | 100744 | 01/30/2016 | RETRAINFEE-JAN2016-0 | | 250.00 | 0.00 | 35.53 | 285.53 |
| | 43434553 | 01/30/2016 | 5096A-WYNGUEST SW MAINT | | 310.20 | 24.80 | 47.58 | 382.58 |
| | | | | Sub Total: | 560.20 | 24.80 | 83.11 | 668.11 |
| FEB-2016 | 100992 | 02/28/2016 | RETRAINFEE-FEB2016-0 | | 250.00 | 0.00 | 31.90 | 281.90 |
| | 43460341 | 02/28/2016 | 5096A-WYNGUEST SW MAINT | | 319.52 | 25.58 | 44.02 | 389.10 |
| | | | | Sub Total: | 569.52 | 25.58 | 75.92 | 671.00 |
| MAR-2016 | 101039 | 03/30/2016 | RETRAINFEE-MAR2016-0 | | 250.00 | 0.00 | 28.02 | 278.02 |
| | 43488872 | 03/30/2016 | 5096A-WYNGUEST SW MAINT | | 319.52 | 25.58 | 38.67 | 383.75 |
| | | | | Sub Total: | 569.52 | 25.58 | 66.69 | 661.77 |
| APR-2016 | 101187 | 04/29/2016 | RETRAINFEE-APR2016-1 | | 250.00 | 0.00 | 24.27 | 274.27 |
| | 31137129 | 04/05/2016 | GLOBAL CONFERENCE | | 1,149.00 | 0.00 | 52.29 | 1,201.29 |
| | 43513320 | 04/29/2016 | 5096A-WYNGUEST SW MAINT | | 319.52 | 25.58 | 33.49 | 378.57 |
| | 43532947 | 04/29/2016 | Actual-1000A-ROYALTY FEE | | 1,084.40 | 0.00 | 105.64 | 1,190.04 |
| | 43532979 | 04/29/2016 | Actual-1800A-RESERVATION FEE | | 677.75 | 0.00 | 66.04 | 743.79 |
| | 43532983 | 04/29/2016 | Actual-1210A-MARKETING FEE | | 542.20 | 0.00 | 52.80 | 595.00 |
| | | | | Sub Total: | 4,022.87 | 25.58 | 334.53 | 4,382.96 |
| MAY-2016 | 101268 | 05/30/2016 | RETRAINFEE-MAY2016-1 | | 250.00 | 0.00 | 20.39 | 270.39 |
| | 1630839 | 05/24/2016 | GDS & INTERNET BKGS | | 87.25 | 0.00 | 7.37 | 94.62 |
| | 22089486 | 05/21/2016 | WYNREWARDS GOFREECR | | -36.75 | 0.00 | 0.00 | -36.75 |
| | 22089536 | 05/21/2016 | WYNREWARDS BONUS | | 30.00 | 0.00 | 2.60 | 32.60 |
| | 22089537 | 05/21/2016 | WYNREWARDS BONUS | | 35.00 | 0.00 | 3.01 | 38.01 |
| | 22089538 | 05/21/2016 | WYNREWARDS BONUS | | 10.00 | 0.00 | 0.88 | 10.88 |
| | 22089973 | 05/21/2016 | WYNREWARDS-5% | | 488.08 | 0.00 | 41.99 | 530.07 |
| | 43538715 | 05/30/2016 | 5096A-WYNGUEST SW MAINT | | 319.52 | 25.58 | 28.14 | 373.22 |
| | 43558433 | 05/30/2016 | Actual-1800A-RESERVATION FEE | | 820.65 | 0.00 | 66.97 | 886.82 |
| | 43558434 | 05/30/2016 | Actual-1210A-MARKETING FEE | | 657.32 | 0.00 | 53.58 | 710.90 |
| | 43558435 | 05/30/2016 | Actual-1000A-ROYALTY FEE | | 1,314.84 | 0.00 | 107.15 | 1,421.78 |
| | TA0630839 | 05/24/2016 | T/A COMMISSIONS | | 66.53 | 0.00 | 5.62 | 72.15 |
| | TC0630839 | 05/24/2016 | T/A COMM SERVICE CHG | | 11.57 | 0.00 | 0.97 | 12.54 |
| | TM0630839 | 05/24/2016 | MEMBER BENEFIT COMM | | 76.74 | 0.00 | 6.48 | 83.22 |
| | TR0630839 | 05/24/2016 | TMC / CONSORTIA | | 5.02 | 0.00 | 0.44 | 5.46 |
| | | | | Sub Total: | 4,136.57 | 25.58 | 345.59 | 4,507.72 |
| JUN-2016 | 101420 | 06/29/2016 | RETRAINFEE-JUN2016-1 | | 250.00 | 0.00 | 16.64 | 266.64 |
| | 1637258 | 06/15/2016 | GDS & INTERNET BKGS | | 129.30 | 0.00 | 9.50 | 138.60 |
| | 22090567 | 06/21/2016 | WR FREE ENROLLMENTS | | -13.60 | 0.00 | 0.00 | -13.60 |
| | 22090568 | 06/21/2016 | WYNREWARDS 5% | | 595.40 | 0.00 | 41.98 | 637.38 |
| | 22090832 | 06/21/2016 | WYNREWARDS GOFREECR | | -257.25 | 0.00 | 0.00 | -257.25 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | 22090874 | 06/21/2016 | WYNREWARDS BONUS | | 40.00 | 0.00 | 2.82 | 42.82 |
| | 22090875 | 06/21/2016 | WYNREWARDS BONUS | | 40.00 | 0.00 | 2.82 | 42.82 |
| | 22091988 | 06/21/2016 | WYNREWARDS BONUS | | 15.00 | 0.00 | 1.06 | 16.06 |
| | 43564375 | 06/29/2016 | 5098A-WYNGUEST SW MAINT | | 319.52 | 25.58 | 22.96 | 368.04 |
| | 43571581 | 06/29/2016 | Actual-1800A-RESERVATION FEE | | 614.87 | 0.00 | 40.88 | 655.75 |
| | 43571582 | 06/29/2016 | Actual-1210A-MARKETING FEE | | 491.90 | 0.00 | 32.71 | 524.61 |
| | 43571583 | 06/29/2016 | Actual-1000A-ROYALTY FEE | | 983.80 | 0.00 | 65.43 | 1,049.23 |
| | TA0637258 | 06/15/2016 | T/A COMMISSIONS | | 303.48 | 0.00 | 22.29 | 325.77 |
| | TC0637258 | 06/15/2016 | T/A COMM SERVICE CHG | | 30.28 | 0.00 | 2.22 | 32.50 |
| | TM0637258 | 06/15/2016 | MEMBER BENEFIT COMM | | 55.18 | 0.00 | 4.07 | 59.25 |
| | TR0637258 | 06/15/2016 | TMC / CONSORTIA | | 12.63 | 0.00 | 0.94 | 13.57 |
| | | | **Sub Total:** | | 3,610.51 | 25.58 | 266.32 | 3,902.39 |
| JUL-2016 | 101635 | 07/30/2016 | RETRAINFEE-JUL2016-0 | | 250.00 | 0.00 | 12.76 | 262.76 |
| | 1643941 | 07/17/2016 | GDS & INTERNET BKGS | | 82.40 | 0.00 | 4.75 | 87.15 |
| | 22092343 | 07/21/2016 | WYNREWARDS GOFREECR | | -183.75 | 0.00 | 0.00 | -183.75 |
| | 22093016 | 07/21/2016 | WYNREWARDS BONUS | | 5.00 | 0.00 | 0.29 | 5.29 |
| | 22093548 | 07/21/2016 | WYNREWARDS BONUS | | 10.00 | 0.00 | 0.56 | 10.56 |
| | 22093549 | 07/21/2016 | WYNREWARDS BONUS | | 20.00 | 0.00 | 1.11 | 21.11 |
| | 22093555 | 07/16/2016 | WYNREWARDS 5% | | 493.08 | 0.00 | 27.37 | 520.45 |
| | 43580300 | 07/30/2016 | 5098A-WYNGUEST SW MAINT | | 319.52 | 25.58 | 17.61 | 382.69 |
| | 43597129 | 07/30/2016 | Actual-1210A-MARKETING FEE | | 595.62 | 0.00 | 30.37 | 625.99 |
| | 43597130 | 07/30/2016 | Actual-1000A-ROYALTY FEE | | 1,191.24 | 0.00 | 60.75 | 1,251.99 |
| | 43597132 | 07/30/2016 | Actual-1800A-RESERVATION FEE | | 744.52 | 0.00 | 37.97 | 782.49 |
| | TA0643941 | 07/17/2016 | T/A COMMISSIONS | | 53.06 | 0.00 | 3.06 | 56.12 |
| | TC0643941 | 07/17/2016 | T/A COMM SERVICE CHG | | 10.67 | 0.00 | 0.62 | 11.29 |
| | TM0643941 | 07/17/2016 | MEMBER BENEFIT COMM | | 62.64 | 0.00 | 3.60 | 66.24 |
| | | | **Sub Total:** | | 3,654.00 | 25.58 | 200.82 | 3,880.38 |
| AUG-2016 | 101787 | 08/30/2016 | RETRAINFEE-AUG2016-4 | | 250.00 | 0.00 | 8.88 | 258.88 |
| | 1650531 | 08/16/2016 | GDS & INTERNET BKGS | | 74.10 | 0.00 | 3.08 | 77.18 |
| | 22094323 | 08/21/2016 | WYNREWARDS GOFREECR | | -147.00 | 0.00 | 0.00 | -147.00 |
| | 22094702 | 08/21/2016 | WYNREWARDS BONUS | | 80.00 | 0.00 | 3.20 | 83.20 |
| | 22094703 | 08/21/2016 | WYNREWARDS BONUS | | 10.00 | 0.00 | 0.41 | 10.41 |
| | 22095230 | 08/21/2016 | WR FREE ENROLLMENTS | | -84.78 | 0.00 | 0.00 | -84.78 |
| | 22095231 | 08/16/2016 | WYNREWARDS 5% | | 539.20 | 0.00 | 21.57 | 560.77 |
| | 43815985 | 08/30/2016 | 5098A-WYNGUEST SW MAINT | | 319.52 | 25.58 | 12.26 | 357.34 |
| | 43622849 | 08/30/2016 | Actual-1800A-RESERVATION FEE | | 850.97 | 0.00 | 30.20 | 881.17 |
| | 43622850 | 08/30/2016 | Actual-1210A-MARKETING FEE | | 680.76 | 0.00 | 24.18 | 704.94 |
| | 43622851 | 08/30/2016 | Actual-1000A-ROYALTY FEE | | 1,361.56 | 0.00 | 48.33 | 1,409.89 |
| | TA0650531 | 08/16/2016 | T/A COMMISSIONS | | 125.36 | 0.00 | 5.20 | 130.56 |
| | TC0650531 | 08/16/2016 | T/A COMM SERVICE CHG | | 21.82 | 0.00 | 0.91 | 22.73 |
| | TG0650531 | 08/16/2016 | GSA FEES | | 4.00 | 0.00 | 0.16 | 4.16 |
| | TM0650531 | 08/16/2016 | MEMBER BENEFIT COMM | | 130.68 | 0.00 | 5.43 | 136.11 |
| | | | **Sub Total:** | | 4,236.21 | 25.58 | 183.79 | 4,425.56 |
| SEP-2016 | 101849 | 09/29/2016 | RETRAINFEE-SEP2016-1 | | 250.00 | 0.00 | 5.13 | 255.13 |
| | 10909814 | 09/28/2016 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 1.22 | 58.91 |
| | 10909815 | 09/28/2016 | WR GUEST SATISFACTION | | 57.69 | 0.00 | 1.22 | 58.91 |
| | 10910394 | 09/28/2016 | GUEST SRVCS TRANSACTION | | 180.00 | 0.00 | 3.38 | 183.38 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | CHARGE | | | | | |
| | 1657150 | 09/14/2016 | GDS & INTERNET BKGS | | 163.50 | 0.00 | 4.58 | 168.08 |
| | 22095481 | 09/21/2016 | WYNREWARDS GIFTCARD | | -50.00 | 0.00 | 0.00 | -50.00 |
| | 22095483 | 09/21/2016 | WYNREWARDS GOFREECR | | -189.00 | 0.00 | 0.00 | -189.00 |
| | 22096810 | 09/21/2016 | WYNREWARDS BONUS | | 10.00 | 0.00 | 0.25 | 10.25 |
| | 22096811 | 09/21/2016 | WYNREWARDS BONUS | | 10.00 | 0.00 | 0.25 | 10.25 |
| | 22096812 | 09/21/2016 | WR FREE ENROLLMENTS | | 5.00 | 0.00 | 0.13 | 5.13 |
| | 22096850 | 09/21/2016 | WYNREWARDS 5% | | -61.34 | 0.00 | 0.00 | -61.34 |
| | 22096951 | 09/21/2016 | WYNREWARDS 5% | | 529.10 | 0.00 | 12.97 | 542.07 |
| | 3119880 | 08/20/2016 | TRAINING ACCESS FEE | | 60.00 | 0.00 | 1.50 | 61.50 |
| | 31203220 | 09/25/2016 | Jan 2016 NT Audit | | 84.54 | 0.00 | 1.90 | 86.44 |
| | 31203438 | 09/25/2016 | Mar 2016 NT Audit | | 71.50 | 0.00 | 1.61 | 73.11 |
| | 31203480 | 09/25/2016 | Jan 2016 NT Audit | | 75.15 | 0.00 | 1.69 | 76.84 |
| | 31203482 | 09/25/2016 | Mar 2016 NT Audit | | 63.55 | 0.00 | 1.43 | 64.98 |
| | 43641257 | 09/29/2016 | 5098A-WYNGUEST SW MAINT | | 319.52 | 25.56 | 7.08 | 352.16 |
| | 43648510 | 09/29/2016 | Actual-1800A-RESERVATION FEE | | 804.10 | 0.00 | 16.48 | 820.58 |
| | 43648511 | 09/29/2016 | Actual-1210A-MARKETING FEE | | 643.28 | 0.00 | 13.19 | 656.47 |
| | 43648512 | 09/29/2016 | Actual-1000A-ROYALTY FEE | | 1,286.56 | 0.00 | 26.38 | 1,312.94 |
| | TA0657150 | 09/14/2016 | T/A COMMISSIONS | | 92.66 | 0.00 | 2.59 | 95.25 |
| | TC0657150 | 09/14/2016 | T/A COMM SERVICE CHG | | 8.19 | 0.00 | 0.23 | 8.42 |
| | TM0657150 | 09/14/2016 | MEMBER BENEFIT COMM | | 31.99 | 0.00 | 0.90 | 32.89 |
| | | | **Sub Total:** | | 4,483.68 | 25.56 | 104.09 | 4,613.33 |
| OCT-2016 | 101974 | 10/30/2016 | RETRAINFEE-OCT2016-0 | | 250.00 | 0.00 | 1.25 | 251.25 |
| | 1663643 | 10/17/2016 | GDS & INTERNET BKGS | | 83.20 | 0.00 | 0.96 | 84.16 |
| | 22097318 | 10/21/2016 | WR FREE ENROLLMENTS | | -53.56 | 0.00 | 0.00 | -53.56 |
| | 22097319 | 10/21/2016 | WYNREWARDS 5% | | 326.09 | 0.00 | 3.10 | 329.19 |
| | 22097365 | 10/21/2016 | WYNREWARDS GIFTCARD | | -25.00 | 0.00 | 0.00 | -25.00 |
| | 22097367 | 10/21/2016 | WYNREWARDS GOFREECR | | -141.75 | 0.00 | 0.00 | -141.75 |
| | 22097824 | 10/21/2016 | WYNREWARDS BONUS | | 2.50 | 0.00 | 0.02 | 2.52 |
| | 22096485 | 10/21/2016 | WYNREWARDS BONUS | | 10.00 | 0.00 | 0.10 | 10.10 |
| | 43567054 | 10/30/2016 | 5098A-WYNGUEST SW MAINT | • | 319.52 | 25.58 | 1.73 | 346.81 |
| | 43874024 | 10/30/2016 | Accrual-1800A-RESERVATION FEE | • | 396.53 | 0.00 | 1.98 | 398.51 |
| | 43874025 | 10/30/2016 | Accrual-1210A-MARKETING FEE | • | 317.22 | 0.00 | 1.59 | 318.81 |
| | 43674043 | 10/30/2016 | Accrual-1000A-ROYALTY FEE | | 634.44 | 0.00 | 3.17 | 637.61 |
| | TA0663643 | 10/17/2016 | T/A COMMISSIONS | | 224.98 | 0.00 | 2.59 | 227.57 |
| | TC0663643 | 10/17/2016 | T/A COMM SERVICE CHG | | 20.83 | 0.00 | 0.24 | 21.07 |
| | TM0663643 | 10/17/2016 | MEMBER BENEFIT COMM | | 28.80 | 0.00 | 0.33 | 28.13 |
| | | | **Sub Total:** | | 2,393.80 | 25.58 | 17.06 | 2,436.42 |
| NOV-2016 | 102217 | 11/29/2016 | RETRAINFEE-NOV2016-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 1676769 | 11/08/2016 | GDS & INTERNET BKGS | | 23.20 | 0.00 | 0.01 | 23.21 |
| | 22098532 | 11/21/2016 | WR FREE ENROLLMENTS | | -10.85 | 0.00 | 0.00 | -10.85 |
| | 22098533 | 11/21/2016 | WYNREWARDS 5% | | 319.81 | 0.00 | 0.00 | 319.81 |
| | 22098908 | 11/21/2016 | WYNREWARDS GIFTCARD | | -25.00 | 0.00 | 0.00 | -25.00 |
| | 43893092 | 11/29/2016 | 5098A-WYNGUEST SW MAINT | • | 319.52 | 25.58 | 0.00 | 345.08 |
| | 43898830 | 11/29/2016 | Actual-1210A-MARKETING FEE | • | 282.06 | 0.00 | 0.00 | 282.06 |
| | 43898831 | 11/29/2016 | Actual-1800A-RESERVATION FEE | • | 352.58 | 0.00 | 0.00 | 352.58 |
| | 43898832 | 11/29/2016 | Accrual-1000A-ROYALTY FEE | | 564.12 | 0.00 | 0.00 | 564.12 |
| | TA0676769 | 11/08/2016 | T/A COMMISSIONS | | 65.68 | 0.00 | 0.03 | 65.71 |
| | TC0676769 | 11/08/2016 | T/A COMM SERVICE CHG | | 10.26 | 0.00 | 0.01 | 10.29 |
| | TM0676769 | 11/08/2016 | MEMBER BENEFIT COMM | | 48.00 | 0.00 | 0.02 | 48.02 |

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | Sub Total: | 2,199.40 | 25.56 | 0.07 | 2,225.03 |
| DEC-2016 | 22100298 | 12/21/2016 | WYNREWARDS BONUS | | 10.00 | 0.00 | 0.00 | 10.00 |
| | 22100995 | 12/21/2016 | WYNREWARDS 5% | | 132.20 | 0.00 | 0.00 | 132.20 |
| | 31237664 | 12/29/2016 | Jun 2016 NT Audit | | 58.79 | 0.00 | 0.00 | 58.79 |
| | 31237665 | 12/29/2016 | Jun 2016 NT Audit | | 66.14 | 0.00 | 0.00 | 66.14 |
| | 43718749 | 12/30/2016 | 5060A-WYNGUEST S/W MAINT | | 319.52 | 25.56 | 0.00 | 345.08 |
| | 43725070 | 12/30/2016 | Accrual-1800A-RESERVATION FEE | • | 248.08 | 0.00 | 0.00 | 248.08 |
| | 43725071 | 12/30/2016 | Accrual-1210A-MARKETING FEE | • | 198.48 | 0.00 | 0.00 | 198.48 |
| | 43725072 | 12/30/2016 | Accrual-1000A-ROYALTY FEE | • | 396.92 | 0.00 | 0.00 | 396.92 |
| | TA0683192 | 12/08/2016 | T/A COMMISSIONS | | 2.27 | 0.00 | 0.00 | 2.27 |
| | | | | Sub Total: | 1,432.38 | 25.56 | 0.00 | 1,457.94 |
| | | | | Grand Total: | 33,864.44 | 305.96 | 1,916.61 | 36,087.01 |

Requested By: Kristine Violette

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

Page 5 of 5

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following immediately:**

1.  Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Howard Johnson Marks.

2.  Remove all interior signage that contains Howard Johnson Marks.

3.  Change advertising billboards to remove Howard Johnson Marks, including any department of transportation or other highway signage.

4.  Stop answering Facility telephone as a Howard Johnson facility.

5.  Remove Howard Johnson name and Marks from any domain name, advertising and brochures.

6.  Return to us or destroy all confidential operations and training manuals.

7.  Remove the Howard Johnson name and Marks from the following items:

    - Guestroom supplies including door signage, ice buckets, cups etc.
    - Bathroom supplies including soap, shampoo, conditioner, etc.
    - Business cards and letterhead
    - Registration cards, folios, guest receipts, including electronic copies
    - Guestroom keys
    - Uniforms and name badges

8.  Paint over or remove any distinctive Howard Johnson trade dress, paint schemes or architectural features.

9.  Remove Howard Johnson name from the Facility's listing on TripAdvisor or any other online traveler review site.

10. It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Howard Johnson facility.

11. We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

UPS CampusShip: Shipment Receipt                                              Page 1 of 1

 **Shipment Receipt**

**Transaction Date: 23 Feb 2017**        **Tracking Number:**        1Z22445X0299061629

---

**1** Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Janu Hospitality, Inc. | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Mr. Hitesh Patel | Kristine Violette | Kristine Violette |
| 1156 Front Street | 22 Sylvan Way | 22 Sylvan Way |
| BINGHAMTON NY 139051119 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| | Telephone:9737637204 | Telephone:9737637204 |
| | email:kristine.violette@wyn.com | email:kristine.violette@wyn.com |

---

**2** Package Information

| | Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|---|
| 1. | Letter (Letter billable) | UPS Letter | | Reference # 1 - 006-1696 |

---

**3** UPS Shipping Service and Shipping Options

| Service: | UPS 2nd Day Air |
|---|---|
| **Shipping Fees Subtotal:** | 17.28 USD |
| Transportation | 16.42 USD |
| Fuel Surcharge | 0.86 USD |

---

**4** Payment Information

| Bill Shipping Charges to: | Shipper's Account 22445X |
|---|---|

| Shipping Charges: | 17.28 USD |
|---|---|
| **A discount has been applied to the Daily rates for this shipment** | |
| Negotiated Charges: | 7.50 USD |
| Subtotal Shipping Charges: | 7.50 USD |
| Total Charges: | 7.50 USD |

Note: This document is not an invoice. Your final invoice may vary from the displayed reference rates.

\* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.